Alejandro P. Gutierrez, SBN 107688
*agutierrez@hathawaylawfirm.com*
**HATHAWAY, PERRETT, WEBSTER, POWERS,
CHRISMAN & GUTIERREZ, APC**
5450 Telegraph Road, Suite 200
Ventura, CA 93006-3577
Tel: (805) 644-7111; Fax: (805) 644-8296

Daniel J. Palay, SBN 159348
*djp@calemploymentcounsel.com*
Brian D. Hefelfinger, SBN 253054
*bdh@calemploymentcounsel.com*
**PALAY HEFELFINGER, APC**
1746 S. Victoria Avenue, Suite 230
Ventura, CA 93003
Tel: (805) 628-8220; Fax: (805) 765-8600

Michael A. Strauss, SBN 246718
*mike@strausslawyers.com*
Aris Karakalos, SBN 240802
*aris@strausslawyers.com*
**STRAUSS & STRAUSS, APC**
226 W. Ojai Ave., Ste. 101-325
Ojai, CA 93001
Tel: (805) 641-6600; Fax: (805) 641-6607

*Attorneys for Plaintiffs and Putative Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUG MINER, an individual, on behalf of himself and other persons similarly situated; GLENN PAYTON, an individual, on behalf of himself and other persons similarly situated; and DOES 1 through 10, <br><br> Plaintiffs, <br><br> vs. <br><br> ECOLAB INC., a Delaware corporation; and DOES 1 through 10, inclusive, <br><br> Defendants. | CASE NO:   2:17-cv-02313-FMO-JC <br><br> <u>CLASS ACTION</u> <br><br> **NOTICE OF MOTION AND RENEWED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION AND PAGA SETTLEMENT** <br><br> <u>Hearing</u> <br> Date:      January 20, 2022 <br> Time:     10:00 a.m. <br> Place:     Courtroom 6D |

i

**TO THE COURT, DEFENDANT AND ITS ATTORNEYS:**

PLEASE TAKE NOTICE that on January 20, 2022, at 10:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Fernando M. Olguin, at the United States Courthouse, 350 W. 1st Street, 6th Floor, Courtroom 6D, Los Angeles, CA 90012, Plaintiffs Doug Miner ("Miner") and Glenn Payton ("Payton") (collectively, "Plaintiffs") will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 23, the Fair Labor Standards Act ("FLSA") and § 2699(l)(2) of the California Labor Code for an Order:

1. Granting preliminary approval of the proposed settlement upon the terms and conditions set forth in the Class, Collective, and PAGA Settlement and Release Agreement (hereinafter referred to as the "Settlement" or the "Class Agreement") that was executed by the parties;

2. Preliminarily certifying, for settlement purposes only, a settlement class in this matter that is comprised of:

> All individuals who have been employed by Ecolab in California as a Service Specialist or Senior Service Specialist or were otherwise paid under Ecolab's Service Specialist Non-Exempt Incentive Compensation Plan between March 24, 2013 and the date preliminary approval is granted and who did not file an individual lawsuit or arbitration demand asserting the same or similar claims as are asserted in this Action.

3. Provisionally certifying, for settlement purposes only, an FLSA collective comprised of:

> All individuals who have been employed by Ecolab in California as a Service Specialist or Senior Service Specialist between March 24, 2014 and the date preliminary approval is granted and who did not file an individual lawsuit or arbitration demand asserting the same or similar claims as are asserted in this Action;

4.      Approving the proposed manner of mailing of the Notice of Settlement set forth in the Settlement and the size and contents of the Notice of Proposed Class Action Settlement;

5.      Appointing and approving Simpluris to administer the settlement payment procedures required by the Settlement ("Claims Administrator"), and preliminarily approving the settlement administration costs;

6.      Preliminarily appointing, for settlement purposes only, as Class Counsel: Hathaway, Perrett, Webster, Powers, Chrisman & Gutierrez APC; Palay Hefelfinger APC; and Strauss & Strauss, APC;

7.      Preliminarily appointing, for settlement purposes only, Plaintiffs Glenn Payton and Doug Miner, as the class representative and Private Attorneys General Act ("PAGA") representative, respectively, in this matter;

8.      Provisionally approving the resolution of the Settlement Class and FLSA Settlement Class claims and finding that the terms of this Class Agreement are sufficient to warrant sending of notice;

9.      Approving the Notice of Proposed Settlement and Final Settlement Approval Hearing (the "Notice of Class Settlement"), Opt-Out Form, and FLSA Opt-In Form, provided herewith;

10.     Authorizing the mailing of the Notice of Class Settlement and accompanying forms to the Settlement Class Members and FLSA Settlement Class Members;

11.     Approving the California Labor and Workforce Development Agency ("LWDA") settlement under California Labor Code section 2699(5)(l)(2) as to the PAGA claims of all individuals employed by Ecolab in California as a Service Specialist or Senior Service Specialist between March 23, 2016, and the date preliminary approval is granted;

12.     Setting deadlines for the submission of objections and for Plaintiffs' counsel to respond thereto;  and

13.     Scheduling a hearing (the "Final Settlement Approval Hearing"), in which the Court shall fully and finally approve the reasonableness of the Settlement and enter final judgment in action.

This renewed motion is made following the conference of counsel pursuant to L.R. 7-3 which took place in November and December 2021.  This Motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authorities; the Declarations of Aris E. Karakalos, Alejandro P. Gutierrez, Brian D. Hefelfinger, Daniel J. Palay, Glenn Payton, and Doug Miner, filed concurrently herewith, all supporting exhibits filed herewith, all other pleadings and papers filed in this action, and any argument or evidence that may be presented at the hearing in this matter.

Dated:  December 14, 2021                   **PALAY HEFELFINGER, APC**

By:        /s/ _____
                Brian D. Hefelfinger
                Attorneys for Plaintiffs and the Putative Class

# **TABLE OF CONTENTS**

I.   RELEVANT BACKGROUND AND FACTS. ........................................................... 1

   A. The Pest Service Specialist Arbitrations ................................................... 1

   B. Case Developments Affecting Settlement Value .......................................... 2

      i.   Challenges to the Lawfulness of the Incentive Plan ........................... 2

      ii.  Remaining Reporting Time Claims ................................................ 3

      iii. California appellate decisions undermine the Plaintiffs' theories .......... 5

II.  THE SETTLEMENT ......................................................................................... 6

   A. Class and Collective Settlement Allocation .............................................. 7

   B. Individual Settlement Payment Formula ................................................. 9

III. ALL RULE 23 REQUIREMENTS ARE MET. ...................................................... 10

   A. The Rule 23 factors are satisfied herein. ................................................ 10

      i.   The Settlement Class is Sufficiently Numerous and Ascertainable. ....... 10

      ii.  Common Questions Of Law And Fact Predominate............................ 11

      iii. A Class Action Is Superior To Individual Resolution Of The Claims. ..... 12

      iv.  Plaintiff Payton's Claims Are Typical of the Class' Claims ................. 13

      v.   Payton and Counsel Will Fairly and Adequately Represent the Class. ..... 14

IV.  PRELIMINARY APPROVAL IS WARRANTED. .................................................. 14

   A. Preliminary Approval is Warranted. ..................................................... 14

      i.   Extent of discovery and stage of the proceedings.............................. 15

      ii.  Amount offered in settlement ..................................................... 15

      iii. Strengths, risks, expense, complexity, and likely duration of litigation ... 16

      iv.  Experience and views of counsel ................................................. 177

      v.   Arms-length negotiations; no collusion between the parties.................. 18

      vi.  The Settlement treats all class members equitably. ........................... 20

      vii. Other factors ........................................................................ 20

   B. The Rule 23(e) Amendments ............................................................. 20

   i.   The Settlement meets all Rule 23(e) Amendment requirements

        as well as Ninth Circuit guidance. ........................................20

   ii.  No "Red Flags" present in this Settlement. ........................................22

V.   APPROVAL OF THE PAGA SETTLEMENT IS WARRANTED. ........................24

VI.  APPROVAL  OF THE FLSA SETTLEMENT IS WARRANTED..........................27

VII. CONCLUSION .........................................................................................29

NOTICE AND RENEWED MOTION FOR PRELIMINARY APPROVAL

# **TABLE OF AUTHORITIES**

**Cases**

*Acmchem Prod., Inc. v. Windsor,*
    521 U.S. 591 (1997)................................................................11

*Acosta v. Trans Union, LLC,*
    243 F.R.D. 377 (C.D. Cal. 2007) ........................................15

*Brewer v. Connell Chevrolet,*
    Orange County Superior Court, Case No. 30-2016-00852123 ................................19

*Briseño v. Henderson,*
    998 F.3d 1014 (9th Cir. 2021)...............................................22

*Cardenas v. McLane Foodservice, Inc.,*
    2011 WL 379413 (C.D. Cal. Jan. 31, 2011) .........................25

*Casas v. Victoria's Secret Stores,*
    No. 2:14-cv-06412-GW (Nov. 21, 2017) ..............................9

*Certified Tire & Service Centers Wage & Hour Cases,*
    --- Cal.Rptr.3d ---, 2021 WL 2766406 (Cal. Ct. App., July 2, 2021) .........................6

*Certified Tire & Service Centers Wage & Hour Cases,*
    28 Cal.App.5th 1 (2018) ..............................................5, 27

*Class Plaintiffs v. City of Seattle,*
    955 F.2d 1268 (9th Cir. 1992)...............................................14

*Douglas v. Xerox,*
    875 F.3d 884 (9th Cir. 2017)................................................27

*Epic Systems Corp. v. Lewis,*
    138 S.Ct. 1612 (2018)..........................................................1

*Franco v. Ruiz Food Products, Inc.,*
    2012 WL 5941801 (E.D. Cal. 2012) ....................................26

*Garcia v. Macy's West Stores*,

    San Bernardino Superior Court, Case No. CIVDS1516007 ...................................... 19

*Garrett v. Bank of America*,

    Alameda County Superior Court, Case No. RG13699027 (October 28, 2016).......... 19

*Grove v. ZW Tech, Inc.*,

    2012 WL 1789100 (D. Kan., May 17, 2012, No. 11-2445-KHV) ............................ 28

*Hanlon v. Chrysler Corp.*,

    150 F.3d 1011 (9th Cir. 1998).................................................................... 11, 14, 15

*Haralson v. U.S. Aviation Servs. Corp.*,

    383 F. Supp. 3d 959 (N.D. Cal. 2019)...................................................................... 26

*In re Celera Corporation Securities Litigation*,

    2015 WL 1482303 (N.D.Cal. Mar. 31, 2015) ......................................................... 28

*In re Mego Fin, Corp. Sec. Litig.*,

    213 F.3d 454 (9th Cir. 2000)...................................................................... 14, 16, 28

*In re Wells Fargo & Co. S'holder Derivative Litig.*,

    445 F.Supp.3d 508 (N.D. Cal. 2020)........................................................................ 19

*Jones v. J.C. Penny Corporation*,

    Los Angeles Superior Court, Case No. 30-2016-00852123...................................... 19

*Ladore v. Ecolab, Inc.*,

    No. CV 11-9386 FMO, 2013 WL 12246339 (C.D. Cal. Nov. 12, 2013)............. 19, 23

*Litty v. Merrill Lynch & Co.*,

    2015 WL 4698475 (C.D. Cal. Apr. 27, 2015) ............................................... 15, 18, 28

*Magadia v. Wal-Mart Assocs., Inc.*,

    384 F. Supp. 3d 1058 (N.D. Cal. 2019),

    *rev'd in part, vacated in part*, 999 F.3d 668 (9th Cir. 2021)..................................... 26

*Mathein v. Pier 1 Imports* (U.S.), Inc.,

    No. 116CV00087DADSAB, 2018 WL 1993727 (E.D. Cal. Apr. 27, 2018) ............... 9

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,*

    221 F.R.D. 523 (C.D. Cal. 2004) ............................................................................18

*Nordstrom Com. Cases,*

    186 Cal.App.4th 576 (2010) ...................................................................................26

*Officers for Justice v. Civil Serv. Comm'n,*

    688 F.2d 615 (9th Cir. 1982).................................................................................16

*Oman v. Delta Airlines Inc.,*

    Case No. S248726 ..............................................................................................5, 8

*Oman v. Delta Airlines, Inc.,*

    9 Cal.5th 762 (2020)......................................................................................16, 27

*Palacios v. Penny Newman Grain, Inc.,*

    No. 1:14–cv–01804–KJM, 2015 WL 4078135 (E.D. Cal. July 6, 2016)...............13

*Radcliffe v. Experian Information Solutions Inc.,*

    715 F.3d 1157 (9th Cir. 2013).........................................................................19, 24

*Rodriguez v. Hayes,*

    591 F.3d 1105 (9th Cir. 2010)...............................................................................13

*Rodriguez v. West Publishing Corp.,*

    563 F.3d 948 (9th Cir. 2009).................................................................................19

*Roes, 1-2 v. SFBSC Management, LLC,*

    944 F.3d 1035 (9th Cir. 2019)...............................................................................22

*Rojas v. Zaninovich,*

    2015 WL 3657172 (E.D. Cal. June 11, 2015) ........................................................28

*Rosales v. El Rancho Farms,*

    2015 WL 4460918 (E.D. Cal. July 21, 2015)........................................................28

*Schiller v. David's Bridal Inc.,*

    No. 10-cv-0616-AWI-SKO, 2012 WL 2117001 (E.D. Cal. June 11, 2012).....13, 26

*Staton v. Boeing Co.,*

    327 F.3d 938 (9th Cir. 2003*)*.................................................................................18

*Van Vranken v. Atl. Richfield Co.*,

    901 F.Supp.294 (N.D. Cal. 1995) ....................................................... 19, 23

*Waldbuesser v. Northrop Grumman Corp.*,

    No. CV 06-6213-AB (JCX), 2017 WL 9614818 (C.D. Cal. Oct. 24, 2017) ............. 24

*Wal-Mart Stores, Inc. v. Dukes*,

    131 S.Ct. 2541 (2011) .............................................................................. 13

*Wells Fargo & Co. S'holder Derivative Litig.*,

    445 F.Supp.3d 508 (N.D. Cal. 2020) ...................................................... 24


**Statutes**

Cal. Lab. Code § 2699 ............................................................................... 26

Cal. Wage Order 5 ....................................................................................... 4

Fed. R. Civ. P. 30 .................................................................................. 2, 11

Fed. R. Civ. P. 23 ............................................................................ 6, 14, 20

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

Plaintiffs Miner and Payton (the "Plaintiffs") submit this Renewed Motion for Preliminary Approval in response to the Court's October 14, 2021, minute order [ECF No. 167] directing the parties to file a renewed motion for preliminary approval of the class and PAGA settlement reached in this matter.

## I.   RELEVANT BACKGROUND AND FACTS

The initial complaint was filed in this matter on March 24, 2017, asserting class, collective, and Private Attorneys General Act ("PAGA") claims on behalf of current and former pest specialist employees who worked for Ecolab any time since March 24, 2014, and were paid pursuant to an incentive compensation plan that was alleged to have provided for an overtime rate that decreased as the worker's hours increased.   The complaint included claims for unpaid overtime under California law and the Fair Labor Standards Act ("FLSA"), wage statement and final pay penalties, unfair business practices, and derivative PAGA penalties.

Considering Plaintiff Miner's arbitration agreement with Ecolab, and after the U.S. Supreme Court decided *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018), this Court ordered Miner's individual claims into arbitration with the American Arbitration Association ("AAA") and stayed the PAGA claims. Pursuant to court order, Miner then filed an arbitration demand on January 16, 2019.  Plaintiff Payton, who did not file an arbitration demand or file an individual lawsuit, joined this court action as a named Plaintiff in November of 2021, through a stipulated Third Amended Complaint.

### A.   The Pest Service Specialist Arbitrations

After Miner's individual claims were ordered to arbitration, over 200 current and former Service Specialists and Senior Service Specialists ("Claimants") filed nearly identical demands against Ecolab with the AAA. In addition, eight current and former Ecolab Service Specialists who had not signed arbitration agreements filed individual complaints in California state court. The vast majority of demands were filed by California employees, and all the AAA Claimants and state court litigants were represented by

Plaintiff's counsel. Their claims focused on the lawfulness Ecolab's Service Specialist Non-Exempt Incentive Compensation Plan ("Plan" or "Incentive Plan") and included claims for: (1) failure to pay proper minimum and overtime wages under California law; (2) failure to pay proper minimum and overtime wages under the FLSA; (3) failure to provide accurate wage statements; and (4) unlawful competition and unlawful business practices. (*Id*.) A limited number of non-California Claimants also filed demands with the AAA asserting claims under the FLSA, with several Claimants also asserting state law claims specific to the state in which they worked. (*Id*.) Beginning September 2019, California Claimants amended their complaints to assert claims for (5) failure to pay reporting time pay and (6) failure to pay split shift wages. (*Id*.)

The AAA assigned the arbitration demands to arbitrators. By agreement, some arbitrators were assigned multiple cases. The parties engaged in considerable formal and informal discovery efforts, including propounding and responding to written requests, more than 40 Claimant depositions, four Fed. R. Civ. P. 30(b)(6) depositions covering more than 20 topics, expert discovery, and the production and analysis of hundreds of thousands of pages of data, time records, customer invoices, emails, call logs, policy documents, and personnel files. (Gutierrez Decl. ¶ 5.) The breadth of discovery permitted the parties to perform a thorough and detailed analysis of the merits of the claims, Ecolab's defenses, and potential exposure for the damages alleged in the cases. (*Id*. at ¶ 6.)

**B.     Case Developments Affecting Settlement Value**

Because the legal theories in this action were thoroughly "tested" via the parallel arbitration proceedings (and before this Court could make substantive rulings on the same issues), several developments in the arbitration proceedings impact the settlement value of this action in significant ways.

**i.     Challenges to the Lawfulness of the Incentive Plan**

Plaintiffs' primary theory of liability has always been that Ecolab's Incentive Plan failed to guarantee Service Specialists would be paid full minimum wages and overtime compensation for each hour worked. Under the Incentive Plan, Ecolab pays (i) a

guaranteed hourly base wage that is set at a level above the federal and state minimum wage, plus (ii) a variable hourly payment for every hour worked based on the revenue per hour generated during the workweek. Plaintiffs, like the Service Specialists who filed individual claims, contend that this variable component violates the FLSA and California law because it is determined, in part, by dividing the revenue Service Specialists generate during the week by total hours worked. This calculation can lead to fluctuations in hourly rates depending on the efficiency with which they work. Due to these fluctuations, Plaintiffs and Claimants both assert the Plan provides an "artificially low" regular rate that can decline as more hours are worked, potentially causing minimum wage and overtime violations. Ecolab refutes these claims. Among other arguments, in Ecolab's view, the Plan's base hourly wage guarantees that employees will always be paid at least the minimum wage for each hour worked, and the overtime paid under the Incentive Plan exactly matches what federal and state law require.

The parties filed cross-motions for summary judgment on the lawfulness of the Plan in more than 40 AAA arbitrations, and participated in multiple merits hearings on the issue, including a two-day trial on two Hawaii Claimants' FLSA claims and numerous summary judgment hearings. (Gutierrez Decl. ¶ 8.) The five arbitrators to rule on the lawfulness of the Plan all found that it complies with both federal and California law and granted judgment in Ecolab's favor.

The parties' extensive briefing and the resulting dispositive decisions have informed the parties' perspective on the strengths and weaknesses of their respective cases. (Gutierrez Decl. ¶ 15.)  Specifically, the fact that every arbitrator to issue a decision has concluded that Ecolab's Incentive Plan complies with both federal and California law in every respect has demonstrated the significant risk that, absent a settlement, the Service Specialists that Plaintiffs seek to represent would likely recover nothing for their claims on the lawfulness of the Incentive Plan. (*See* Gutierrez Decl. ¶ 24.)

### ii.  Remaining Reporting Time Claims

As the weaknesses of the primary Incentive Plan claims became clear, Claimants

began to add claims for reporting time to the AAA arbitrations. Plaintiffs added the same claims to this case in their Second and Third Amended Complaints. Under California law, reporting time pay may be due when an employee is either (a) "required to report for work . . . but is not put to work or is furnished less than half [of his] usual or scheduled day's work," or (b) "required to report for work a second time in any one workday and is furnished less than two (2) hours of work on the second reporting[.]" Wage Order 5, § 5(A)-(C). Plaintiffs contend these protections were triggered when they were required to respond to customer calls outside of regular working hours, especially during weekend duty or in the afternoon prior to working a night shift later in the evening. For its part, Ecolab contends that the reporting time provisions do not apply to Service Specialists because they, not Ecolab, determine when they work. Wage Order 5, § 5(C)(3) ("The foregoing reporting time pay provisions are not applicable when . . . [t]he interruption of work is . . . not within the employer's control."). Furthermore, Ecolab maintains that merely performing "work" for an employer is insufficient to trigger reporting time pay. Rather, the regulations come into play only when the employee is required to physically "report to work" and is denied the opportunity to work. *See* Wage Order 5, § 5.

In connection with this litigation as well as the arbitrations mentioned previously, the parties have analyzed volumes of individualized data concerning when Service Specialists worked, who they called, which customers they messaged, and which customers they visited. (Gutierrez Decl. ¶ 25.) Those efforts have confirmed that, regardless of the substantive merits, the potential value of these claims is limited, typically ranging from less than $100 per Service Specialist on the low end to a few thousand dollars on the high end. (*Id*. ¶ 26.)

Moreover, as with the Plan-related claims, the parties engaged in hotly contested litigation over reporting time claims in the AAA arbitrations. The only arbitrator to rule on the merits of those claims found in Ecolab's favor; one other arbitrator found disputed material facts and determined that resolution would require an evidentiary hearing. These outcomes informed settlement negotiations and provided the parties with insight as to the

strengths and weaknesses of their respective positions. (Gutierrez Decl. ¶ 16.) Not only is there a significant risk that Plaintiffs and the remaining Service Specialists they seek to represent would not prevail on the merits, but the attempt to adjudicate the claims on an individualized basis has highlighted both the difficulties they would face in any attempt to litigate the claim on a class or representative basis and the low value of the claims themselves. Hefelfinger Decl. ¶ 19.

### iii. California appellate decisions undermine the Plaintiffs' theories.

One of the cases that most impacts the Incentive Plan claims is *Certified Tire & Service Centers Wage & Hour Cases*, 28 Cal. App. 5th 1 (2018). In *Certified Tire*, the California Court of Appeal for the Fourth Appellate District addressed arguments very similar to the arguments made here—namely, that a compensation plan violated California law where it paid an hourly wage for all work performed, but the earned hourly rate varied from pay period to pay period based on productivity measures. *Id*. at 12-13. The Court of Appeal held in *Certified Tire* that the plan was lawful, stating that "[a]lthough the hourly rate differs from pay period to pay period because technicians have the opportunity to *increase* their guaranteed minimum hourly rate based on the generation of production dollars, the technicians are always paid on an hourly basis for all hours worked at a rate above minimum wage *regardless* of their productivity, and *regardless* of the type of activity in which they were engaged during those hours." *Id*. (emphasis in original).

*Certified Tire* was appealed to the California Supreme Court in January 2019 and was stayed by the Supreme Court pending decision in another case, captioned *Oman v. Delta Airlines Inc.*, Case No. S248726. Claimants filed motions with the AAA to stay their arbitration cases pending the outcome of *Oman*, which they argued would be largely determinative of their Incentive Plan claims. On June 29, 2020, the California Supreme Court issued its opinion in *Oman*, ruling in the employer's favor and finding that the plan at issue in that case was lawful. In so finding, the Supreme Court ruled California law permits compensation schemes that compensate all hours worked at or above minimum wage, even if particular components of those schemes fail to attribute to each and every

1  compensable hour a specific amount equal to or greater than minimum wage.  *Id.*

2      After the *Oman* decision, the Fourth Appellate District was directed to vacate and

3  reconsider in light of *Oman* its prior decision in *Certified Tire*. On July 2, 2021, the

4  appellate court affirmed its prior judgment, again finding the compensation program at

5  issue to be lawful. *Certified Tire & Service Centers Wage & Hour Cases*, --- Cal.Rptr.3d --

6  -, 2021 WL 2766406, *1 (Cal. Ct. App., July 2, 2021). Specifically, the court found that

7  "Certified Tire made payments to its technicians on an hourly basis at an hourly rate that

8  exceeded the minimum wage for all hours worked," and that it "did so without borrowing

9  from wages that were promised under the applicable compensation agreement, as

10  prohibited by *Oman*." *Id.* at *10.

11      These two decisions further bolstered Ecolab's position and confirmed the extreme

12  difficulty Plaintiffs would have trying to prevail on their Plan-related claims absent this

13  Settlement.  They thus support Plaintiffs' request for preliminary approval.

14  **II.    THE SETTLEMENT**

15      To resolve this class action, the Parties have entered a detailed "Class, Collective,

16  and PAGA Settlement and Release Agreement" (the "Class Agreement" or the

17  "Settlement").  Through the Settlement, the parties seek to resolve this case including all

18  wage-related claims alleged or that could have been alleged. (Settlement, p. 15).[1]

19      With respect to the class claims, the parties seek to resolve the claims of a

20  Settlement Class of all current and former Ecolab employees who worked as Service

21  Specialists or Senior Service Specialists in California or were otherwise paid under

22  Ecolab's Incentive Plan between March 24, 2013, and the date preliminary approval is

23  granted, except for those who filed an individual lawsuit or arbitration demand asserting

24

25

26  [1] *Fed. R. Civ. Proc.* Rule 23(e)(3) specifies that "any agreement made in connection with the [settlement] proposal" should be identified.  Exhibit 1 to the Hefelfinger Declaration is the Class

27  Agreement for which approval is sought herein.  That agreement is part of a broader agreement that comprehensively settled this case, as well as the AAA arbitrations discussed above and several single

28  plaintiff cases pending in the Superior Court for the County of Los Angeles. A copy of that agreement will be provided to the Court upon request.

the same or similar claims as Plaintiffs. (*Id.,* at p. 3; *see also,* FLSA Settlement Class Members, similarly defined from March 24, 2014, forward).[2]   With respect to the representative PAGA claims, the parties seek to resolve PAGA claims on behalf of the State of California and all individuals employed by Ecolab in California as a Service Specialist or Senior Service Specialist or otherwise paid under Ecolab's Incentive Plan between March 23, 2016, and the date preliminary approval is granted ("PAGA Recipients"). (*Id.,* ¶ 10(h)).

### A.   Class and Collective Settlement Allocation

The Settlement provides for a Gross Settlement Amount ("GSA") of $181,687.50 to resolve all pending class and PAGA claims. (Settlement, ¶ 14).   From the GSA, the Settlement allocates the following amounts: Attorney's Fees of up to $33,375.00 (18.37%); Costs of up to $8,000.00; Service Award payments of $2,250.00 to Doug Miner as the PAGA representative, and of $750.00 to Glenn Payton as the class representative; an LWDA PAGA Allocation of $18,750.00 (75% of $25,000), and Class Administration Costs of up to $15,000. (Settlement, ¶¶ 40-41.) Thus, the Net Settlement Amount ("NSA") available for distribution to Service Specialists in resolution of the class, PAGA and FLSA claims is estimated to be at least $103,562.50 ($97,312.50 for class/FLSA claims, and $6,250.00 as the 25% PAGA employee allocation). The PAGA Allocation will, pursuant to statute, be distributed among all PAGA Recipients.  Settlement ¶ 34.[3]

The parties have drafted a proposed Class Notice to inform all recipients regarding the course of proceedings that led to this Settlement and the allocation of the GSA funds. *See* Hefelfinger Decl. Ex. 2. There is no reverter, and any amounts not awarded in fees, costs, service payments, or the PAGA Allocation will be added back to the NSA.

---

[2] The class omits the Claimants from the Settlement Class, because they have all already agreed to the Settlement and released their individual claims or had their individual claims dismissed with prejudice. Hefelfinger Decl. ¶ 29.
[3] Because the individual proceedings did not resolve any PAGA claims, the PAGA Recipients include all Service Specialists during the relevant time period, regardless of whether they filed an individual arbitration or lawsuit.

In *per capita* terms, if the parties' Settlement is approved and the anticipated attorney's fees, costs, PAGA allocation, and service payments are awarded, the parties estimate that each participating Settlement Class Member will receive, on average, approximately $300.00. In contrast, in the absence of a settlement agreement and given that key merits determinations thus far have resolved in Ecolab's favor, there is a significant risk that the Settlement Class Members and FLSA Settlement Class Members would not recover *any* monetary damages at all. This is not only because these individuals did not file or pursue claims in litigation on their own behalf, but also because the parties now know that doing so would be almost entirely fruitless. All five arbitrators to consider the Incentive Plan have found it lawful under California and federal law, and the subsequent decisions in *Oman* and *Certified Tire* have only made it less likely that a future litigant might prevail. And the only arbitrator to rule on the merits of the reporting time claim ruled in Ecolab's favor.

Given $0.00 value Plaintiffs assign to their primary Plan-based claims, the GSA of $181,687.50 is reasonable considering the remaining claims and risks. Here, Claimants' counsel estimates class damages on the non-PAGA claims to be approximately $390,000 in aggregate, with up to $1.74M in PAGA penalties. (Gutierrez Decl. 22). The NSA thus represents about 27% of the non-PAGA class damages. These settlement figures are eminently reasonable in light of the significant risks Plaintiffs would face in litigating these claims. (*See* Gutierrez Decl., ¶¶ 22-30, highlighting litigation risks).

The $300.00 average estimated allocation for each participating Service Specialist is also reasonable. (Gutierrez Decl., ¶ 28). As noted above, the arbitrations and the *Oman* and *Certified Tire* decisions have established that Ecolab would be all but certain to prevail on Plaintiffs' Incentive Plan-based claims. Class Counsel thus gives those claims no value. That leaves only the low-value reporting time claims. Class Counsel has determined that the probability-weighted reporting time wages owed in any given workweek with provable violations was only approximately $10-20, depending on the number of minutes worked in a given reporting. (Gutierrez Decl., ¶ 26). Thus, even using the $20 upper range, the

average settlement amount will provide approximately 14 to 15 workweeks' worth of damages. That recovery is eminently reasonable, particularly as Class Counsel's review of the data has confirmed that potential reporting time violations occurred quite rarely, and the maximum potential recovery would range from less than $100 per employee on the low end to a few thousand dollars on the high end. Also, each potential violation would have to be individually proven through witness and documentary evidence, which is time-consuming, expensive, and further risks a $0.00 recovery, particularly given the class waivers signed by the majority of the Service Specialists.  Finally, there was always the potential that service specialists could lose altogether on the merits of the reporting time liability.  Such risk inherently demands an even lower settlement value.  Accordingly, an average payout of $300.00 is a reasonable settlement value and should receive approval.

Moreover, the Settlement provides for average payments on par with settlements approved in comparable cases. For example, in *Mathein v. Pier 1 Imports* (U.S.), Inc., No. 116CV00087DADSAB, 2018 WL 1993727, at *10 (E.D. Cal. Apr. 27, 2018), the district court granted final approval of a proposed settlement for reporting time, split shift, minimum wage, and other derivative claims, with an average class member payment of $236. The court found the settlement, which recovered approximately 28% of the global damages estimate, was fair and adequate. Likewise, in *Casas v. Victoria's Secret Stores*, No. 2:14-cv-06412-GW (Nov. 21, 2017), the district court approved a $12,000,000 class settlement of reporting time, split shift, minimum wage, and other derivative claims that awarded 43,000 class members average payment of around $300.

With the demonstrated weaknesses of the Plan-based and reporting time claims, the Settlement compares favorably with the case law, and falls within the range of "reasonableness."

**B.     Individual Settlement Payment Formula**

Settlement Class Members and FLSA Settlement Class Members will receive a portion of the NSA as determined by the following formula, which is set forth in the Settlement:

NOTICE AND RENEWED MOTION FOR PRELIMINARY APPROVAL

- $50 will be allocated to each qualifying Class Member who elects to opt-in to the FLSA release, to be taken off the top of the fund before the amounts due to other members are calculated;

- 12% of the remaining amount will be split equally among Class Members who worked for Ecolab in California and terminated/resigned between March 24, 2014, and the date of preliminary approval, for Labor Code Section 203 claims;

- 8% of the remaining amount will be split equally among Class Members who worked for Ecolab in California between March 24, 2016, and the date of preliminary approval, for Labor Code Section 226 claims;

- 50% of the remaining amount will be split among Class Members who spent the majority of their workweeks working night shifts ("Night Specialists") based on the number of workweeks worked between March 24, 2013, and the date of preliminary approval; and

- 30% of the remaining amount will be split among Class Members who spent the majority of their workweeks working day shifts ("Day Specialists") based on the number of workweeks worked between March 24, 2013, and the date of preliminary approval.

Night Specialists are allocated a larger percentage than Day Specialists because, in Plaintiffs' counsel's view, Night Specialists had stronger reporting time claims given Ecolab's policies and procedures regarding "administrative tasks." Hefelfinger Decl. ¶ 31. In addition, the Court-approved PAGA allocation will be split *pro rata* among all PAGA Recipients based on the number of workweeks worked during the relevant time period.

**III.   ALL RULE 23 REQUIREMENTS ARE MET.**

   **A. The Rule 23 factors are satisfied herein.**

      **i. The Settlement Class is Sufficiently Numerous and Ascertainable.**

Based on data gathered during the litigation, the parties estimated that the size of the Settlement Class would be about 340 individuals. As the class remains open through preliminary approval, it has grown since then to the extent that additional California employees were hired into the Service Specialist position and paid under the Incentive Plan. Ecolab's employment and pay records are sufficient to identify all Settlement Class Members. As such the Class is both sufficiently numerous and ascertainable.

### ii.        Common Questions of Law And Fact Predominate.

Rule 23(a) and 23(b)(3) require that: "the questions of law or fact common to class members predominate over any questions affecting only individual members." The predominance "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir. 1998)(quoting *Acmchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Here, questions of law *and* fact predominate, as the Service Specialists who comprise the Settlement Class all labored under the same wage and hour policies during the relevant period. The parties undertook extensive documentary and deposition discovery concerning the Service Specialist position in this Action. (Karakalos Decl., ¶ 15).  Discovery in this case included exchange of tens of thousands of pages of documents, as well as depositions of Plaintiff Miner and Ecolab's corporate 30(b)(6) representative. In addition, the AAA arbitrations involved similar discovery, as well as contested expert discovery concerning the Incentive Plan's function. (*Id.,* ¶ 14). The parties' parallel arbitral discovery included over 40 Claimant depositions, four 30(b)(6) depositions covering more than twenty topics, and the production and analysis of hundreds of thousands of pages of Ecolab data, including time records, customer invoices, emails, call logs, policy documents, and personnel files. (Karakalos Decl., *supra,* at ¶ 17).

Questions of law or fact common to compensation of the Settlement Class "predominate" over any questions affecting only individual members. The common Incentive Plan and employment policies on which Payton's reporting time claims are based serve as "convincing proof" that the common questions in this matter "predominate." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 623-24 (1997); *Hanlon*, 150 F.3d at 1022. The common questions surrounding the Settlement Class and the wage/hour obligations owed to its members present a "significant aspect of the case" that "can be resolved for all members of the class in a single adjudication," providing clear justification to handle the case on a representative rather than an individual basis. *See Hanlon*, 150 F.3d at 1022. Indeed, the claims challenging the lawfulness of the Incentive Plan present a

classically certifiable claim as there is no dispute that the same formula was used to calculate the regular and overtime rates for every class member.

### iii. A Class Action is Superior to Individual Resolution of the Claims.

It is equally clear that the Settlement Class Members' interests are best served in the class action context. Given the multiple and well-reasoned arbitration decisions unanimously finding the Incentive Plan lawful, coupled with the developments in the law as articulated in *Oman* and *Certified Tire, supra*, there is no realistic benefit to individual Class Members in pursuing their Plan-based claims on an individual basis because those claims are all but certain to fail. There is also little potential benefit to pursuing reporting time claims on an individual basis given their low value, the expert costs necessary to litigate them, and the mixed results in the various closely related arbitrations. As there is no realistic path for any individual claimant to recover any damages outside of the proposed settlement, the class action device is thus demonstrably "superior."

Moreover, this case is distinguishable from a typical class action in that the absent Settlement Class Members have had ample opportunity to pursue individual claims but declined to do so. The Service Specialists who would be included as Class Members have worked alongside over 200 co-workers who elected to pursue individual arbitrations (and who have since lost or decided to settle those arbitrations). Unlike typical wage-and-hour class members, then, the Settlement Class Members here knew how to find counsel who were ready, willing, and able to represent them had they wanted to bring their own claims. (Hefelfinger Decl., ¶ 34). They chose not to pursue that option. Whether it was because they did not see the potential reward as worth the risk/time, believed they were compensated fairly, or simply did not care, the absent Class Members have thus indicated a desire not to pursue individual claims. Under such circumstances, a class resolution is superior because the alternative is no case at all.[4]

---

[4] The remaining Rule 23(b)(3) superiority considerations are not addressed herein as they irrelevant in the settlement context. *See Palacios v. Penny Newman Grain, Inc.*, No. 1:14–cv–01804–KJM, 2015

### iv.    Plaintiff Payton's Claims are Typical of the Class' Claims.

The same factors that support commonality also support "typicality." *See* Fed. R. Civ. P. 23(a)(3). Typicality focuses on the relationship of facts and issues between the class and its representatives. "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Since all Ecolab Specialists in the proposed Settlement Class worked under the same Incentive Plan and employment policies, the issues presented in this case may be resolved on a class basis or, as the Supreme Court aptly put it, "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). That is because the disputed issues here are primarily legal, *i.e.*, whether Ecolab's wage and hour policies comply with California and federal laws.

"Like the commonality requirement, the typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical." *Rodriguez v. Hayes,* 591 F.3d 1105, 1124 (9th Cir. 2010). Here, Payton is a former Ecolab Service Specialist who seeks to represent other Service Specialists who labored under the same Incentive Plan. His overtime, minimum wage, and derivative claims all arise from the way in which his regular rate was calculated.   The regular rate was calculated in the same way for the rest of the Settlement Class. (Hefelfinger Decl., ¶ 17).  Payton's claims—and Ecolab's potential defenses thereto—will thus turn on the same legal theory and the same type of factual circumstances as will any other Class Member's. Similarly, Payton and the other Settlement Class Members were subject to the same written employment policies relevant to the reporting time claim and had similar control over the schedules they worked, meaning that Payton's reporting time claims are typical of those of the rest of the Settlement Class Members.

Payton's claims are thus "reasonably co-extensive with those of absent class

WL 4078135, at *6 (E.D. Cal. July 6, 2016) (citing *Schiller v. David's Bridal Inc.*, No. 10-cv-0616-AWI-SKO, 2012 WL 2117001, at *10 (E.D. Cal. June 11, 2012)).

members." Ecolab's policies present common legal issues that would drive resolution of the claims at issue and there are no unique defenses. Typicality is thus established.

### v. Payton and Counsel Will Fairly and Adequately Represent the Class.

Finally, the record establishes that Payton and Class Counsel are adequate representatives for the Settlement Class. Payton has assisted in the prosecution of claims for several years even though he only recently signed on as a co-class representative (to address a standing issue articulated by this Court). (Payton Decl., ¶ 8-11). His interests align with the Settlement Class he now seeks to represent. Neither Class Counsel nor Payton are aware of any intra-class conflicts as the same written policies applied to all Settlement Class Members. *Id.* Class Counsel are experienced wage and hour attorneys, who expended significant efforts in their attempt to prevail on behalf of both Payton and the Class. (*See generally,* Decls. of Gutierrez, Hefelfinger, and Karakalos in Support).

### IV.    PRELIMINARY APPROVAL IS WARRANTED.

"[Rule 23] requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026. To determine whether a settlement agreement meets these standards, the court considers a number of factors, including "the strength of the plaintiff's case, the risk, expense, complexity, and likely duration of further litigation, the risk of maintaining class action status throughout trial, the amount offered in settlement, the extent of discovery completed, and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement." *Stanton*, 327 F.3d at 959 (internal citations omitted). The settlement may not be a product of collusion among the negotiating parties. *In re Mego Fin, Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992)). To the extent these factors are not subsumed by those of Rule 23(e)(2), the court must also consider the factors of said Rule.  FRCP 23(e)(2) (Adv. Comm. note to 2018 amendment).

### A. Preliminary Approval is Warranted.

"At the preliminary approval stage, some of the factors cannot be fully assessed.

---

14

Accordingly, a full fairness analysis is unnecessary." *Litty v. Merrill Lynch & Co.*, 2015 WL 4698475, *8 (C.D. Cal. Apr. 27, 2015). Rather, the court need only decide whether the settlement is potentially fair, *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386 (C.D. Cal. 2007), in light of the strong judicial policy in favor of settlement of class actions. *Class Plaintiffs*, 955 F.2d 1276. "[T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Hanlon*, 15 F.3d at 1027.

### i. Extent of discovery and stage of the proceedings

For a court to approve a proposed settlement, "[t]he parties must . . . have engaged in sufficient investigation of the facts to enable the court to intelligently make an appraisal of the settlement." *Acosta*, 243 F.R.D. at 396 (internal quotation marks omitted). Here, as discussed above, the parties have vigorously investigated and contested the claims at issue in both court and arbitration. In addition to reviewing classwide data provided in the context of the parties' settlement discussions, Counsel served written discovery in more than 160 arbitration proceedings, took Rule 30(b)(6) depositions on more than 20 topics, defended more than 40 Claimant depositions, and filed amended arbitration demands asserting reporting time and split shift claims. Ecolab produced volumes of employee-specific documents, which Counsel analyzed, including data regarding time-keeping, customer invoices, pay, overtime records, emails, and call logs. The parties also have the benefit of reasoned opinions from experienced arbitrators ruling upon both the Plan-based and reporting time claims.

Each side thus has a clear idea of the strengths and weaknesses of their respective cases, allowing the Court to conclude that the extent of discovery and the stage of proceedings weigh in favor of preliminary approval.

### ii. Amount offered in settlement

In determining whether the amount offered in settlement is fair, a court compares the settlement amount to the parties' estimates of the maximum amount of damages recoverable in a successful litigation. *In re Mego*, 213 F.3d at 459.  Here, the gross settlement amount to resolve all class and PAGA claims is $181,687.50.  (Settlement, ¶ 14).  As noted in the Gutierrez Declaration, the calculation of the maximum non-PAGA value of class claims is approximately $390,000.  (Gutierrez Decl., ¶23).  The theoretical value of the PAGA claims is approximately $1.7 million; however, the settlement value is much lower, given, *inter alia*, that reporting time claims were not included in Miner's original Complaint or PAGA letter, that the only arbitrator to rule on the merits of the reporting time claims decided them in Ecolab's favor, that the Court has discretion to reduce default PAGA penalties, and that Plaintiffs would expect Ecolab to challenge the manageability of the PAGA claims if this case were to be litigated.  (*Id.*, at ¶ 24).

As discussed above, Counsel had to form their exposure analysis taking into consideration the multiple arbitration rulings obtained in Specialist arbitrations to-date, as well as the intervening California Supreme Court guidance regarding compensation plans as set forth in *Oman v. Delta Airlines, Inc.* and *Certified Tire*.  Thus, although the net settlement amount represents less than the maximum "theoretical" value of this litigation, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair." *In re Mego*, 213 F.3d at 459 (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982)). In *In re Mego*, the Ninth Circuit considered the difficulties in proving the case and determined the settlement amount, which was one-sixth of the potential recovery, was fair and adequate. *Id.*  Given the adverse arbitration merits rulings and California precedent, as well as the existence of class waivers that would make it impossible to litigate this case on a class wide basis and the fact that the absent class members here are more like conscientious objectors than in a more typical case, the settlement amount is reasonable.

### iii. Strengths, risks, expense, complexity, and likely duration of litigation

Several of the above factors weigh in favor of preliminary approval.  First, the

outcome of this case, if litigated to conclusion, is unlikely to result in a more favorable outcome to the affected workers. Indeed, the arbitrations concluded to date have had unfavorable results across the board on the key liability issues. While the arbitration decisions are not "binding" here, litigation is unpredictable by nature, and the arbitration outcomes demonstrate that this case presents many risks and uncertainties.

Second, this Court has already once compelled class members to individual arbitrations. If the case were to continue without a settlement, only the PAGA action would remain in court, with the remaining Specialists (who have signed arbitration agreements) having to litigate their claims in arbitration. Third, the Covid-19 crisis has caused significant delays in all litigation, so this case (and the individual arbitrations were they to be recommenced) could last many more months or years until its final conclusion. Fourth, Ecolab could always appeal unfavorable rulings. As a large public company, Ecolab has the resources to litigate the case on appeal. Fifth, litigation is very expensive, especially when the issues implicate expert witnesses with specialized expertise (thus, essentially requiring Specialists to hire their own expert witness or be at a severe disadvantage in arbitration). Were this case to continue, the costs of litigation would skyrocket. Sixth, even if Payton could overcome the class waiver issue, there is a potential difficulty of maintaining the suit as a class action, since Ecolab would contest class certification, as it has done in other wage/hour actions. Finally, there is a risk of incurring expense of trial without recovery, given that all arbitrators to-date have concluded that Ecolab's Incentive Plan complies with California wage-and-hour laws and the only arbitrator to rule on the merits of the reporting time claims resolved those claims in Ecolab's favor. Overall, these factors weigh in favor of preliminary approval.

### iv. Experience and views of counsel

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (internal citation and quotation marks omitted). Here, the parties reached settlement after review of their claims and

defenses, and after dispositive motion rulings issued by various arbitrators testing the legal theories of the case.   Karakalos Decl. at ¶ 13.  Payton's Counsel recommends the settlement.  *Id.,* at ¶ 62; Gutierrez Decl., ¶ 12; Hefelfinger Decl. at ¶ 30.  Accordingly, this factor weighs in favor of preliminary approval.

### v. Arms-length negotiations; no collusion between the parties

"To determine whether there has been any collusion between the parties, courts must evaluate whether 'fees and relief provisions clearly suggest the possibility that class interests gave way to self-interests, thereby raising the possibility that the settlement agreement is the result of overt misconduct by the negotiators or improper incentives for certain class members..." *Litty*, 2015 WL 4698475, at *10 (quoting *Staton v. Boeing Co.,* 327 F.3d 938, 961 (9th Cir. 2003)).  As an initial matter, the settlement negotiations were conducted at arms-length. The parties engaged in substantial discovery and contested litigation, across hundreds of arbitrations and multiple court actions.  (Karakalos Decl. at ¶¶ 21-26).   The parties then put their legal theories to the test, in front of multiple arbitrators in the form of dispositive motion practice.  The highly contested nature of the Specialist litigation across multiple forums, with settlement negotiations occurring after rulings were obtained, is strongly indicative that the settlement process was <u>not</u> collusive.

The financial terms of the Settlement also do not reflect any collusion between the parties.  Class Counsel's requested fees ($33,375.00) will be far below their lodestar for the amount of time and legal services provided.   It also is below the Ninth Circuit's "benchmark" for percentage awards, and any fees or costs that are not awarded will revert to the class.

Plaintiffs Miner and Payton seek modest service enhancements totaling $3,000, for their contributions and years of service to the case.  More specifically, Plaintiffs' request for a $2,250 service payment for Doug Miner, and $750 for Glenn Payton, falls within the approved range of incentive awards given to representative plaintiffs in wage/hour class and PAGA settlements. When considering Miner's *years* of service participating and being involved in this Action, the service enhancement request is modest and supported by the

case law.  *See, e.g., Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 300 (N.D. Cal. 1995) ($50,000); *Ladore v. Ecolab, Inc*., No. CV 11-9386 FMO (JCX), 2013 WL 12246339, at *8 (C.D. Cal. Nov. 12, 2013) ($25,000 and $15,000); *In re Wells Fargo & Co. S'holder Derivative Litig*., 445 F. Supp. 3d 508, 534 (N.D. Cal. 2020) ($25,000); *Waldbuesser v. Northrop Grumman Corp*., No. CV 06-6213-AB (JCX), 2017 WL 9614818, at *8 (C.D. Cal. Oct. 24, 2017) ($25,000). And, while a conditional incentive award can, in theory, create a conflict of interest with the class (*see Radcliffe v. Experian Information Solutions Inc.*, 715 F.3d 1157, 1161 (9th Cir. 2013)), the Settlement here protects against that potential conflict. The Settlement explicitly states that it is "not contingent upon approval of the full amount of the requested service payment," and that "a Court order granting no service payment or a service payment in a lesser amount shall not invalidate the Settlement." (Settlement at ¶ 41.) Rather, any amounts not ultimately awarded will revert to the NSA to be distributed among the participating Specialists.

Moreover, the service payment to Doug Miner is appropriate even in his role as a PAGA class representative.  Trial courts in California routinely approve reasonable service awards in the context of PAGA cases. *See, e.g., Garrett v. Bank of America*, Alameda County Superior Court Case No. RG13699027 (October 28, 2016) (three PAGA plaintiffs awarded $25,000 each as service awards); *Brewer v. Connell Chevrolet*, Orange County Superior Court Case No. 30-2016-00852123 (PAGA settlement in which representative plaintiff received $15,000); *Jones v. J.C. Penny Corporation*, Los Angeles Superior Court Case No. 30-2016-00852123 (PAGA settlement in which the PAGA representative received service award of $10,000); *Garcia v. Macy's West Stores*, San Bernardino Superior Court Case No. CIVDS1516007 (court approved a PAGA settlement with service award of $10,000).  The Ninth Circuit has also recognized this approach noting that, among other things, incentive payments to named plaintiffs can be used to "recognize their willingness to act as a private attorney general." *See, e.g., Rodriguez v. West Publishing Corp*., 563 F.3d 948, 958 (9th Cir. 2009).

Also, the lower service award of $750 for Glenn Payton is warranted under the case

law, considering that he has assisted the case greatly, but only expended a fraction of the time and effort contributed by Plaintiff Miner.   (Payton Decl., ¶ 12).

### vi. The Settlement treats all class members equitably.

The Settlement does not unfairly grant preferential treatment to any Class Member. The parties have carefully constructed a formula for payments to Settlement Class members to ensure an equitable distribution of the settlement funds based on objective criteria, including, without limitation, their performance of night-shift versus day-shift work, and the number of workweeks they worked during the relevant time period. (Settlement, at ¶ 34; *see also,* Hefelfinger Decl. at ¶¶ 21, 31-32 [explaining rationale for all sub-group allocations under the global Settlement Agreement]).

### vii.    Other factors

In addition to the factors discussed above, the Court may consider the risk of maintaining class action status throughout the trial, the presence of a governmental participant, and the reaction of the class members to the proposed settlement. *Staton*, 327 F.3d at 959 (internal citations omitted). However, these factors either do not apply or consideration of them is premature. For example, there is no governmental "participant" in this action. Additionally, the Settlement Class members have yet to receive notice of the Settlement and have not had an opportunity to comment or object to its terms.

### B. The Rule 23(e) Amendments

### i. The Settlement meets all Rule 23(e) Amendment requirements as well as Ninth Circuit guidance.

Rule 23(e) was amended to require parties seeking preliminary approval to "provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class." *Fed. R. Civ. P.* 23(e)(1)(A). In making that determination, courts consider four factors: (1) whether class representatives and class counsel have adequately represented the class, (2) whether the proposed settlement was negotiated at arm's length, (3) whether the relief provided for the class is adequate, taking into account the costs, risks, and delay of trial and appeal, the effectiveness of the proposed method of distributing relief

to the class, including the method of processing claims, the terms of any proposed award of attorney's fees, and any agreement required to be identified under Rule 23(e)(3), and (4) whether the settlement proposal treats class members equitably relative to each other.

Here, where the interests of both the workers and the employer have been zealously represented by competent counsel for years, the requirements of the amended Rule are unquestionably satisfied. First, as detailed in the counsel declarations supporting this motion, the parties contested the merits of the underlying legal issues before this Court as well as before multiple arbitrators, after conducting thorough discovery and utilizing expert witness analysis and testimony in both contexts. Class counsel have devoted substantial time and effort trying to prevail on the legal issues on behalf of the Settlement Class.

Second, the proposed Settlement was negotiated at arm's length, and only after several "attempts" on the merits were made after discovery and through contested motion practice.  Defendant is represented by two multi-national employment defense law firms, and Plaintiffs and the putative class members are represented by three experienced, employee-side wage/hour class action firms. Only after the legal issues were tested and ruled upon by multiple arbitrators, and only after the courts in *Oman* and *Certified Tire*, *supra*, weighed in on central issues at play in this litigation, did the parties negotiate the proposed Settlement. Accordingly, the proposed resolution is "arms-length."

Third, the relief provided for the class under the proposed Settlement is "adequate" under the Rule, taking into account the costs, severe risks, the delay of trial and appeal, the effectiveness of the proposed method of distributing relief to the class, including the method of processing claims, the terms of any proposed award of attorney's fees, and the pertinent agreements described by Rule 23(e)(3). Most notably, every arbitrator that addressed the lawfulness of the Incentive Plan ruled in favor of the Defendant, making the "risk" factor weigh heavily in favor of the proposed Settlement. Moreover, as noted above, the average relief that will be afforded to each Settlement Class Member—est. $300— compares favorably to potential exposure associated with their claims. *See* Gutierrez Decl. ¶ 26-28 (estimating that, even if a Class Member were to prevail on the merits of their

reporting time claims, those claims are only worth between $100 and a few thousand dollars). This factor therefore weighs in favor of the proposed Settlement.  The only "related" agreement required to be identified under Rule 23(e)(3) has already been disclosed to the Court; a copy of that global agreement will be provided to the Court on request.

Finally, the Settlement proposal treats class members "equitably" relative to each other. As detailed in § VII, "Calculation of Settlement Payments to Settlement Class Members," the pro rata division of the Settlement Class payment amounts is determined by a breakdown that is weighted equitably, as follows:

- $50 for FLSA claims;

- 12% for Labor Code Section 203 claims;

- 8% for Labor Code Section 226 claims;

- 50% based on night shift workweeks; and

- 30% based on the day shift workweeks.

Since the formula for allocation is based on the claims held and number of workweeks worked during the relevant time period by Settlement Class Members it is entirely fair and equitable within the meaning of the Rule 23(e) amendments.

### ii.  No "Red Flags" present in this Settlement.

The Settlement in this case is distinguishable from the recent *Briseño v. Henderson,* 998 F.3d 1014, 1020 (9th Cir. 2021) and *Roes, 1-2 v. SFBSC Management, LLC,* 944 F.3d 1035, 1056-58 (9th Cir. 2019) cases in this Circuit, both of which actually support approval of the Settlement here, given the contrast with the terms of the settlements in those cases.[5]

---

[5] In rejecting the settlement in *Briseño*, the Ninth Circuit took issue with the fact that, although the settlement was "valued" at more than $100 million, including injunctive relief, the class ultimately received less than $1 million. 998 F.3d at 1026. The primary reason for this disparity was the "claims made" nature of the settlement, combined with a reversion of unclaimed amounts to the defendant, such that when only 97,880 of the 15 million class members filed claims, only $993,919 was paid. *Id.* at 1021. Moreover, although the parties nebulously valued the injunctive component of the settlement at $27 million, the Ninth Circuit ultimately determined it was worthless. Thus, at the end of the day, class counsel's requested fee award of almost $7 million, was roughly seven times the amount paid by the defendant and received by the settlement class.  Similarly, in *Roes*, more of the available settlement

None of the "red flag" issues are present here. Unlike *Briseño* and *Roes*, the Settlement Amount does not include any injunctive relief that must be speculatively valued by the Court; the entire Settlement Amount will be paid in cash. The Settlement also is not "claims made" or reversionary. Defendant will pay 100 percent of the Settlement Amount, plus employer taxes, with no reversion for unclaimed funds, and every settlement class member who does not opt out will receive a settlement payment; any uncashed amounts will be distributed to a *cy pres*. In addition, the terms of the Settlement do not suggest any collusion between the parties designed to generate excessive attorneys' fees. As noted herein, and in the supporting counsel declarations (which explain the rates and hours that will be requested), the requested fee is far below the lodestar amount for the time and legal services provided. In fact, unlike the fee requests in *Briseño* (seven times the ultimate payout) and *Roes* (more than half the settlement fund)*,* the requested fees here are a tiny fraction of the lodestar figure and far less than even the 25% "benchmark" of the total Settlement Amount. (Hefelfinger Decl., ¶ 11-14). There is also no "clear sailing" provision. Rather, the Settlement "is not contingent upon approval of the full amount of the requested fees and costs, and a Court order granting no attorneys' fees and/or costs or an attorneys' fee award and/or costs for a lesser amount than requested shall not invalidate the Settlement." (Settlement, ¶ 40). As there is no reverter, if the Court awards less than the requested fees, the difference will be returned to the Class.

Likewise, Plaintiffs' requests for modest service payments of $2,250 and $750, falls within the approved range of incentive awards given to representative plaintiffs in wage/hour class and PAGA settlements. *See, e.g., Van Vranken v. Atl. Richfield Co.*, 901 F.

---

money ($2 million) ultimately went to the attorneys ($950,000) than to the class members ($864,115), which the Ninth Circuit said should have invited closer examination of the non-cash portions (injunctive relief and coupons) of the settlement used to justify the fee award that were worth much less than valued. 944 F.3d at 1051. The Ninth Circuit in *Roes* also took issue with (i) the reversionary aspects of the settlement that benefitted defendants, not class members, and (ii) the $20,000 payments to the class representatives for a "general release" side deal, which was in addition to the $5,000 payments they received for being class representatives. *Id*. at 1056-1060.

Supp. 294, 300 (N.D. Cal. 1995) ($50,000); *Ladore v. Ecolab, Inc.*, No. CV 11-9386 FMO (JCX), 2013 WL 12246339, at *8 (C.D. Cal. Nov. 12, 2013) ($25,000 and $15,000); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508, 534 (N.D. Cal. 2020) ($25,000); *Waldbuesser v. Northrop Grumman Corp.*, No. CV 06-6213-AB (JCX), 2017 WL 9614818, at *8 (C.D. Cal. Oct. 24, 2017) ($25,000). And, while a conditional incentive award can, in theory, create a conflict of interest with the class (*see Radcliffe v. Experian Information Solutions Inc.*, 715 F.3d 1157, 1161 (9th Cir. 2013)), the Settlement here protects against that potential conflict. The Settlement explicitly states that it is "not contingent upon approval of the full amount of the requested service payment," and that "a Court order granting no service payment or a service payment in a lesser amount shall not invalidate the Settlement." (Settlement at ¶ 41).[6]  For these reasons, the concerns flagged by the *Briseño* and *Roes* cases simply do not present in this matter, and there is no evidence of collusion between the parties.  Accordingly, all factors support preliminary approval of the Settlement. The Settlement is fair, adequate, and reasonable.

## V.     APPROVAL OF THE PAGA SETTLEMENT IS WARRANTED.

The potential PAGA value in this matter, and the settlement allocation for PAGA, also is reasonable and should receive preliminary approval. Claimants' counsel has reasonably estimated potential damages for the Settlement Class Members, in aggregate to be approximately $390,000 in value, with derivative PAGA penalties at a theoretical amount of $1.74M for all potentially "aggrieved" Service Specialists.

---

[6] Similarly, the Court need not be concerned about any perceived "preferential treatment" for class counsel's individual clients.  While Claimants are estimated to receive an average settlement payment of $550 (excluding any PAGA recovery), the claims they released in exchange for those settlement payments were worth significantly more as they executed general releases encompassing all potential claims, known and unknown, arising from their employment with Ecolab.  Settlement Class Members, in contrast, are releasing only the more narrow set of claims being certified for settlement purposes.  In addition, the Claimants faced greater risk exposure and bore greater burdens in pursuing their individual cases.  In proceeding with arbitration, Claimants were required to participate in discovery, including in many cases depositions, and were exposed to potential arbitration costs (including potentially significant expert fees) and arbitrator fees in the event of adverse rulings. None of these detriments presented to the Settlement Class members (other than the named Plaintiffs).

1    Based on data provided by Ecolab during settlement negotiation and a thorough

2    review of applicable written policies and relevant case law, Class Counsel has determined

3    that the theoretical PAGA exposure is dependent upon the reporting time violations that

4    could reasonably be expected to prove successful. This is because, despite Class Counsel's

5    best efforts, no Claimant succeeded on any Plan-based claims before any arbitrator.  Nor

6    did any Claimant successfully vindicate a reporting time pay violation.

7    As noted above, Class Counsel's review of detailed employee records has confirmed

8    that potential reporting time violations occurred relatively rarely, particularly for Service

9    Specialists who worked day shifts. Based on that review, Class Counsel believes it would

10   be generous to assume that Service Specialists who worked nights would have a potential

11   reporting time violation for 50% of their workweeks and that Service Specialists who

12   worked days would have a potential reporting time violation for 10% of their work weeks.

13   This would mean that there are approximately 17,000 workweeks that could implicate

14   PAGA civil penalties in the matter. At $100 per employee, per workweek (*see* Labor Code

15   § 2699(f)), this provides a theoretical maximum PAGA civil penalty exposure of $1.74M.

16   (Gutierrez Decl., ¶ 22).

17   There are several reasons, however, why this theoretical maximum exposure may be

18   unrealistic. First, the original complaint in this manner did not include a separate reporting

19   time claim. Miner did not submit a second PAGA notice identifying that claim until

20   February 5, 2020 and did not amend the complaint until 2021. As a result, Miner expects

21   Ecolab would have challenged the applicable statute of limitations for the reporting time

22   claim. If Ecolab had prevailed on that issue, the potential exposure would have dropped

23   very significantly, *i.e.*, by approximately 60%.

24   Second, to recover any PAGA penalties, Miner would be required at trial to prove

25   each of the underlying Labor Code violations. *See Cardenas v. McLane Foodservice, Inc.*,

26   2011 WL 379413, at *3 (C.D. Cal. Jan. 31, 2011) ("Given the statutory language [of

27   PAGA], a plaintiff cannot recover on behalf of individuals whom the plaintiff has not

28   proven suffered a violation of the Labor Code by the defendant."). Because Miner's PAGA

claims are based on the same alleged unlawful conduct as the class claims, the PAGA claims are subject to the same risks on the merits. Given (1) the likelihood that Ecolab would continue to prevail on the Plan-based claims as it has in all the arbitrations to date, and (2) the possibility that Ecolab would prevail on the reporting time claims as it did before the only arbitrator to decide that issue on the merits, it is appropriate to award significantly less than the maximum potential value of the PAGA claims. *See Nordstrom Com. Cases*, 186 Cal. App. 4th 576, 579 (2010) ("[T]rial court did not abuse its discretion in approving a settlement which does not allocate any damages to the PAGA claims."). The fact-intensive nature of the reporting time claims and the significant costs and individualized evidence necessary to demonstrate each individual violation additionally weigh in favor of approving the Settlement.

Third, the PAGA statute requires courts to consider whether to reduce a PAGA penalty if, "based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." Cal. Lab. Code § 2699(e)(2). Courts often reduce PAGA awards especially where, as is the case here, the penalty amount dwarfs the harm done to employees and there is no evidence that the employer acted in bad faith. *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 973 (N.D. Cal. 2019); *Magadia v. Wal-Mart Assocs., Inc.*, 384 F. Supp. 3d 1058, 1100 (N.D. Cal. 2019), *rev'd in part, vacated in part*, 999 F.3d 668 (9th Cir. 2021). Thus, assuming Plaintiffs were able to prove any Labor Code violations, Class Counsel believes there is a significant likelihood PAGA penalties would be reduced downwards.

Fourth, the amount of the PAGA payment is on par or even exceeds amounts that have been approved by courts in other cases. For instance, in *Franco v. Ruiz Food Products, Inc.*, 2012 WL 5941801 (E.D. Cal. 2012), the court approved a total PAGA penalty amount of $10,000, with the $2,500 employee portion divided between as many as 2,055 current and former employees. In *Schiller v. David's Bridal, Inc.*, *supra*, the court also approved a PAGA penalty amount of $10,000, with the $2,500 employee portion divided between as many as 3,326 individuals.

For these reasons, the parties' Agreement—which proposes $25,000 of the Gross Settlement Amount be allocated to Miner's PAGA claim, with twenty-five percent to be distributed to the PAGA Recipients—is fair and reasonable.[7]

## VI.   APPROVAL  OF THE FLSA SETTLEMENT IS WARRANTED.

The Third Amended Complaint—like the original Complaint—includes claims under the Fair Labor Standards Act ("FLSA"). Those FLSA claims are based on the same theory as Plaintiffs' California minimum wage and overtime claims: that because Ecolab's Incentive Plan calculated employees' regular and overtime rates at the end of each workweek based on revenue generated and hours worked, it unlawfully "provided for an overtime rate that decreased as the worker's hours increased." *See, e.g.,* SAC ¶¶ 9, 35, 51. It is thus unsurprising that every arbitrator to rule Ecolab's favor did so on *both* the California and FLSA claims, often on nearly indistinguishable grounds.  Hefelfinger Decl. ¶ 24.  Thus, counsel has every reason to believe that should these issues be weighed by this Court, the result would be identical.

For two reasons, though, Plaintiffs' minimum wage and overtime claims were weaker under the FLSA than they were under the California Labor Code.  Hefelfinger Decl. ¶ 25. First, the key question adjudicated in Ecolab's favor in *Oman* and *Certified Tire* under the California Labor Code had already been decided in Ecolab's favor under the FLSA in 2017 in *Douglas v. Xerox,* 875 F.3d 884 (9th Cir. 2017) (holding that pay plan fully compensated employees for all hours worked by using workweek average to arrive at appropriate rate). Hefelfinger Decl. ¶ 26. Second, because the FLSA provides for only weekly overtime while California provides for daily and weekly overtime, the potential exposure associated with the federal claims was markedly lower. It was also entirely subsumed by the California exposure since Plaintiffs would not have been able to "double

---

[7] To the extent that the Court orders a different PAGA Allocation, the Settlement provides that "a Court order approving a PAGA Allocation at a lesser or greater amount shall not invalidate the Class Agreement or change the Gross Settlement Amount but instead shall increase or decrease the remaining NSA." Settlement ¶ 45.

recover" the portion of the California damages that overlapped with his FLSA claim. Given this, the parties have assigned only $50 to the FLSA claims, which FLSA Settlement Class Members will have the option to claim by submitting an Opt-In Form, either electronically or by returning the paper form mailed to them. (Settlement, ¶ 27).  The Settlement Administrator will send FLSA Settlement Class Members a reminder notice and, because the Settlement is non-reversionary, any FLSA allocations not claimed will revert to the NSA to be distributed among the Settlement Class Members.

The proposed FLSA payment of $50 for those who opt-in to receive it, is a fair and reasonable compromise of the *bona fide* disputes being released by the Settlement.  The factors relevant to determining whether a FLSA settlement is reasonable include the course of the negotiations, the existence of any factual or legal questions that place the outcome of the litigation in doubt, the benefits of immediate recovery balanced against litigation, and the parties' belief the settlement is fair. *See, e.g., Grove v. ZW Tech, Inc.*, 2012 WL 1789100, at *5 (D. Kan., May 17, 2012; *Villalobos v. Calandri Sonrise Farm LP*, 2015 WL 12777959, at *2 (C.D. Cal. Dec. 4, 2015). To determine whether the settlement amount is reasonable, the Court must consider the amount obtained in recovery against the estimated value of the class claims if successfully litigated. *Litty v. Merrill Lynch & Co., Inc.*, 2015 WL 4698475, at *9 (C.D. Cal. Apr. 27, 2015) (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), as amended June 19, 2000). A fractional recovery of the possible maximum recovery amount may nonetheless be fair in light of the uncertainties of trial and difficulties in proving the case. *In re Mego*, 213 F.3d at 459 (approving a settlement that was assumed to be roughly one-sixth of the maximum potential recovery); *Rosales v. El Rancho Farms*, 2015 WL 4460918, at *14 (E.D.Cal. July 21, 2015) (approving a settlement with a class payment that was roughly one-quarter of the maximum potential recovery); *Rojas v. Zaninovich*, 2015 WL 3657172, at *12 (E.D.Cal. June 11, 2015) (approving a settlement with a class payment that was roughly one-half of the maximum potential recovery); *In re Celera Corporation Securities Litigation*, 2015 WL 1482303, at *6 (N.D.Cal. Mar. 31, 2015) (approving a settlement with a class payment

1  of approximately eight percent of the maximum potential recovery).

2        As discussed above, major reasons support the FLSA settlement component.  The

3  key question adjudicated in Ecolab's favor in *Oman* and *Certified Tire* under the California

4  Labor Code had already been decided in Ecolab's favor under the FLSA in 2017 in

5  *Douglas v. Xerox*, *supra*.   Second, a two-day arbitration trial in Hawaii on Claimants'

6  FLSA claims resulted in a favorable decision for Ecolab.   Third, because the FLSA

7  provides for only weekly overtime while California provides for daily and weekly

8  overtime, the potential exposure associated with the federal claims was markedly lower; it

9  was also entirely subsumed by the California exposure since Plaintiffs would not have been

10  able to "double recover" the portion of the California damages that overlapped with their

11  FLSA claims. Accordingly, the parties have assigned only $50 to the FLSA claims, and

12  approval is warranted.

13        **VII.   CONCLUSION**

14        Based on the foregoing, it is respectfully requested that the Court grant preliminary

15  approval of the proposed class and PAGA settlement, as set forth herein.

16  Dated:  December 14, 2021              **PALAY HEFELFINGER, APC**

17

18                         By:      /s/_____

19                                  Brian D. Hefelfinger
                                    Attorneys for Plaintiffs and the Putative Class
20

21

22

23

24

25

26

27

28

**NOTICE AND RENEWED MOTION FOR PRELIMINARY APPROVAL**